247 P.3d 457 (2011)
STATE of Washington, Respondent,
v.
Nicholas Lawrence MILLER, Appellant.
No. 64350-9-I.
Court of Appeals of Washington, Division 1.
February 7, 2011.
*458 Jennifer J. Sweigert, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
Walter Joseph Sowa, Attorney at Law, Charles Franklin Blackman, Everett, WA, for Respondent.
DWYER, C.J.
¶ 1 Where a defendant violates the conditions of his suspended sentence granted pursuant to the special sex offender sentencing alternative (SSOSA), even where the violation occurs 9 years into a 10-year suspended sentence, a trial court may properly revoke the SSOSA, reinstate the original sentence, and include an additional term of community custody to be served after incarceration. The prohibition against double jeopardy is not violated by the imposition of a term of postincarceration community custody notwithstanding that the defendant already served community custody during the suspended SSOSA sentence. However, the term of postincarceration community custody that may be imposed is limited by statute. Because the trial court herein imposed a term of community custody exceeding the three-year term authorized by the legislature, we remand for resentencing. We affirm in all other respects.

I
¶ 2 In 2000, when he was 18 years old, Nicholas Miller was found guilty, after a stipulated bench trial, of rape of a child in the first degree, a violation of RCW 9A.44.073. The conviction was a result of Miller having performed oral sex on his six-year-old nephew in 1998. Because Miller had no prior criminal history, the standard sentencing range for his crime was a term of incarceration set between 93 and 123 months. Miller was sentenced to 123 months, but the trial court suspended the sentence pursuant to SSOSA. Thus, he was incarcerated for only four months and was ordered to complete a 36-month outpatient sex offender treatment program.
¶ 3 After his release from incarceration and shortly after beginning his sexual deviancy treatment, Miller violated the conditions of his suspended sentence by moving into a friend's home in which a minor child lived. As a sanction for this violation, Miller was incarcerated for 45 days. The trial court also modified Miller's sentence to include a provision stating, "Defendant shall NOT have contact with minor children, no exceptions." Clerk's Papers (CP) at 99.
¶ 4 Miller completed treatment in June 2003.[1] Upon Miller's termination from treatment, two conditions were modified: he was allowed to consume small amounts of alcohol, and he was allowed to "pursue prospective partners" with the guidance of his community corrections officer (CCO). CP at 94. Miller then abided by the conditions of his suspended sentence for the next several years, regularly meeting with his CCO and passing his required polygraph tests.
*459 ¶ 5 In September 2008, Miller requested that the trial court modify his sentence by reducing the period of suspension from 123 months to 93 months. The motion was transferred to our court as a personal restraint petition. Because the Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW, does not authorize a change in sentence once imposed, we dismissed the petition. Subsequently, the trial court modified the conditions of Miller's SSOSA to allow the Department of Corrections to modify the requirements of Miller's supervision.
¶ 6 In March 2009, Miller requested that the trial court modify the conditions of his sentence so that his consumption of alcohol was unrestricted, that he would be allowed to have a relationship with a woman who had a minor child, and that he would be allowed to reside with or be in the presence of a child without the supervision of an adult. A few weeks later, Miller informed his CCO that he was withdrawing his motion to modify. However, that same day, Miller rescheduled the hearing on the motion to a date in May. When confronted with his deception regarding the motion to modify, Miller initially denied rescheduling the hearing. However, he later admitted that he had changed the date.
¶ 7 In June 2009, Miller was given permission to travel to Las Vegas, on the condition that he would submit to a polygraph examination upon returning to Washington. Miller took the required polygraph exam, which revealed that Miller had answered deceptively to the question of whether he had stayed the night anywhere other than at his two authorized locations. The polygraph test was inconclusive as to Miller's responses to questions concerning whether he had been around minor children or had sexual contact with anyone. When the polygraph examiner inquired about Miller's deceptive answer, Miller explained that he had stayed the night at a friend's house.
¶ 8 Miller met with his CCO after the polygraph. His CCO requested Miller's friend's contact information, in order to verify Miller's explanation. Miller then admitted that he was in a relationship with a woman, Tracy. He had dated Tracy for a short while in 2008 but had discovered that she had an eight-year-old son who was blind and mildly autistic. According to Miller, he broke up with Tracy after his CCO recommended against the relationship. However, in 2009, Miller began dating her again, despite his CCO's earlier disapproval.
¶ 9 Miller initially denied having any contact with his girlfriend's son. However, after he was informed that his next polygraph would focus on his contact with minors, Miller admitted that he had given the boy high-fives, had exchanged a few words with the boy, and had allowed the boy to look at his tattoos. After Miller's next polygraph indicated that Miller was not answering truthfully to questions regarding Tracy's son, Miller admitted that he had indeed been around the child unaccompanied. On occasion, when Tracy needed help, Miller would pick her son up from the school bus drop-off and watch the child for several hours until Tracy got home. In addition, Miller had been alone with the young boy once when Tracy was sick.
¶ 10 Miller's CCO filed a notice of violation, alleging six violations and recommending revocation of Miller's SSOSA "[d]ue to the long term, serious nature of the violations and the current status of Mr. Miller in the child's family." CP at 16. At the violation hearing, the trial court heard testimony from both Miller and his therapist. The trial court vacated Miller's SSOSA and revoked the order suspending the execution of Miller's sentence, thus imposing Miller's original sentence, with credit for time served. The trial court also imposed 10 years of community placement, to be served after Miller's incarceration.
¶ 11 Miller appeals.

II
¶ 12 Miller first contends that the trial court abused its discretion by revoking his suspended sentence. We disagree.
¶ 13 The SSOSA statute provides that a sentencing court may suspend the sentence of a first-time sexual offender if the offender is shown to be amenable to treatment. RCW 9.94A.670; former RCW 9.94A.120(8)(a)(i), (ii) (1998). A SSOSA sentence may be revoked *460 at any time where there is sufficient proof to reasonably satisfy the trial court that the defendant has violated a condition of the suspended sentence or has failed to make satisfactory progress in treatment. State v. McCormick, 166 Wash.2d 689, 705, 213 P.3d 32 (2009); RCW 9.94A.670(10); former RCW 9.94A.120(8)(a)(iv). Once a SSOSA is revoked, the original sentence is reinstated. State v. Dahl, 139 Wash.2d 678, 683, 990 P.2d 396 (1999).
¶ 14 A trial court's decision to revoke a SSOSA suspended sentence is reviewed for an abuse of discretion. State v. Partee, 141 Wash.App. 355, 361, 170 P.3d 60 (2007). A trial court abuses its discretion only where the trial court's decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). A decision based on an error of law is based on an untenable reason and may constitute an abuse of discretion. Noble v. Safe Harbor Family Pres. Trust, 167 Wash.2d 11, 17, 216 P.3d 1007 (2009); State v. Nieto, 119 Wash.App. 157, 161, 79 P.3d 473 (2003).
¶ 15 Miller contends that the trial court herein had an erroneous understanding of the law regarding the amount of community custody time that Miller would have remaining if he were incarcerated as a sanction for his current violations. A defendant's term of community custody is tolled during any period that the defendant is incarcerated, whatever the reason for the confinement. RCW 9.94A.171(3).[2] Millerrelying only on a portion of a sentence uttered by the trial courturges us to conclude that the trial court was operating under the misapprehension that Miller's term of community custody would continue to run during any period of time that Miller was incarcerated as punishment for his current violations. Had the trial court been guided by such a belief, it would have misunderstood the law.
¶ 16 Contrary to Miller's contentions, however, the statement emphasized by Miller does not demonstrate that the trial court held such a mistaken belief:
There's only about a year, less than a year, if he would be incarcerated for some, perhaps, significant portion of that period of time, to learn these new behaviors and demonstrate that he's changed.
Report of Proceedings (RP) at 101. The sentence, taken as a whole, indicates that the trial court was concerned that Miller would have a short period of time to correct his behavior before the trial court lost jurisdiction over him. It is undeniable that whether Miller was sanctioned with incarceration or not, Miller would have less than a year of community custody to serve before the trial court lost jurisdiction over the matter.[3] Thus, the trial court did not misunderstand the law when it revoked Miller's SSOSA.
¶ 17 To the contrary, the trial court revoked Miller's suspended sentence because it found several compelling reasons to revoke the SSOSA rather than impose sanctions. To begin, Miller's current violations involve a very vulnerable minor child who was of an age similar to that of the child against whom he had previously offended:
Mr. Miller started a relationship with a young woman that had a child, not just any child, a child of the age similar to the age of the child that Mr. Miller offended against, a very highly vulnerable child.
RP at 98. Additionally, the violations committed by Miller and the circumstances under which the violations were discovered are extremely serious:
I'm just really struggling in trying to figure out why the Court should essentially show Mr. Miller an incredible amount of leniency, because he pretty flagrantly disregarded *461 some of the most serious conditions, other than committing a new offense, which, obviously, I don't think anybody here would dispute that he would be revoked had he done that. But short of doing that, this is probably the most serious kind of violation that he could commit, being alone with a child, being involved with a woman, not completely disclosing his offense behavior, and then lying about it to a number of people.
RP at 100-01.
¶ 18 Moreover, Miller engaged in a series of deceptive acts in order to prevent his CCO or the trial court from discovering his extremely concerning behavior:
And then Mr. Miller engaged in a series of what can only be termed deceptive acts where he lied to his former treatment provider, where he lied to his CCO, where he was caught with the polygraph.
RP at 98-99. The trial court concluded that Miller knew what he needed to do in order to maintain his present relationship without violating the conditions of his suspended sentencebecause both his CCO and therapist had talked with him about the possibilities:
And I just don't have any illusions that Mr. Miller didn't understand what he needed to do in order to pursue this relationship, because it was pretty clearly explained to him. . . . I mean, there's a whole set of circumstances by which Mr. Miller could have fairly easily complied with the terms of his probation and pursued the relationship with this young woman.
RP at 99. However, Miller decided instead to continue his relationship with Tracy and her vulnerable son, revealing his noncompliant attitude regarding the conditions of his community custody:
But apparently at this stage, I can only think that Mr. Miller had just got to the point where he was really kind of done with probation. He was trying very hard to talk the court into terminating the probation. He was trying very hard to talk both the court and his community corrections officer into significantly changing the terms of his probation and he made a very significant series of decisions whereby he decided to not abide by the terms of his probation and then lie about it, which is a bad thing to do, but in the context of he was nine years into his probation and supervision, it's almost incomprehensible to the Court.
RP at 99.
¶ 19 The trial judge had also presided over Miller's violation proceeding in 2001 and she specifically recalled that Miller was in danger of being revoked even then:
I've been the judge that has presided over all of these hearings, and I recall the hearing in 2001 . . . when he had a number of violations which were also very significant and was in grave danger of being revoked at that period of time.
I recall talking to Mr. Miller and telling him in no uncertain terms that he was in grave danger of being revoked and that if there were any further violations, he would be revoked. He indicated to me that he understood that.
RP at 97-98.
¶ 20 Miller's therapist had testified that Miller presented a relatively low risk of reoffense, although his current violations for unsupervised contact with a minor child raised Miller's risk under some measurement tools. Miller's therapist had indicated that Miller's risk to the community likely could be managed in the long term. Given that the length of Miller's community custody could not be extended, the trial court was rightfully concerned that Miller had less than one year left of community custody during which Miller could learn new behaviors and could demonstrate that he is capable of following rules:
So the question for the Court is do we want to take a chance on somebody who shows they don't have a lot of interest in following the rules, that they're more interested in trying to change the rules of the game as opposed to following them? There's only about a year, less than a year, if he would be incarcerated for some, perhaps, significant portion of that period of time, to learn these new behaviors and demonstrate that he's changed.
RP at 101.
¶ 21 The trial court very clearly indicated that if Miller's present violations had occurred *462 earlier in Miller's suspended sentence, then, without question, his SSOSA would have been revoked:
I don't think there's any question that if these violations had come up within a couple years of the hearing in 2001, I don't think anybody here has any serious doubt that the Court would have revoked the SSOSA and there probably wouldn't have been much fighting about it.
RP at 100. The trial court did not believe that any of the testimony or arguments before itthat Miller had successfully completed treatment, had gone a very long time without violations, and was a low to medium risk of reoffenseprovided a sufficient reason to show leniency in this case:
So I guess the question is, because this behavior occurred after he has successfully completed his treatment and has been under supervision reasonably successfully for a lengthy period of time, does that somehow mitigate the behavior that clearly would have resulted in a SSOSA revocation had it occurred earlier on in the probation? Is that somehow a reason to treat Mr. Miller differently at this point in time?. . . .
Really, about the only reasons that are being set before the Court not to revoke him is the fact that he's so far along in his probation and that because the treatment provider assesses him as a low to moderate risk to reoffend, the conduct should be punished by a period of jail and another opportunity to show that he can follow the rules.
The Court has take [sic] into account that we only have about one more year of supervision. The Court can't extend supervision any farther.
RP at 100-01.
¶ 22 The trial court concluded that Miller's violations and deception justified revoking the suspended sentence:
But on balance, I think Mr. Miller has just not given the Court a lot of options, given his behavior. . . . [B]ased on the extremely serious nature of these violations and the reasons that would be considered not to revoke the SSOSA, I just cannot find it within me to not revoke the SSOSA. So I am going to grant the State's motion, and the SSOSA will be revoked.
RP at 101-02.
¶ 23 As evidenced by the numerous, legitimate reasons to revoke Miller's SSOSA sentence that were articulated by the trial court, the trial court's decision was not made on untenable grounds or for untenable reasons. Whether it was a year or less than a year that Miller had remaining in his term of community custody, the amount of time was too short for Miller to demonstrate that he had changed his behavior, in the view of the trial court. Accordingly, the trial court did not abuse its discretion by revoking Miller's SSOSA.

III
¶ 24 Miller next contends that the trial court violated the prohibition against double jeopardy when it did not credit the amount of time that Miller had served in community custody as part of his suspended sentence against the newly-imposed term of community custody to be served after incarceration. We disagree.
¶ 25 The double jeopardy clause of the Fifth Amendment provides three protections: (1) it protects against a second prosecution for the same offense after an acquittal; (2) it protects against a second prosecution for the same offense after a conviction; and (3) it "protect[s] against `multiple punishments for the same offense' imposed in a single proceeding."[4]Jones v. Thomas, 491 U.S. 376, 381, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989) (quoting North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), overruled on other *463 grounds by Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989)). Miller argues that the order revoking his suspended sentence constitutes multiple punishments for the same offense in violation of the prohibition against double jeopardy because it fails to credit Miller for the time he served in community custody by virtue of his SSOSA.[5]
¶ 26 As the United States Supreme Court has explained, "in the multiple punishments context" the interest the double jeopardy clause seeks to protect is "`limited to ensuring that the total punishment did not exceed that authorized by the legislature.'" Thomas, 491 U.S. at 381, 109 S.Ct. 2522 (quoting United States v. Halper, 490 U.S. 435, 450, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), abrogated on other grounds by Hudson v. United States, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)). As our Supreme Court has stated, "[a] double jeopardy violation does not occur simply because two adverse consequences stem from the same act." In re Pers. Restraint of Mayner, 107 Wash.2d 512, 521, 730 P.2d 1321 (1986).
¶ 27 Miller contends that the time he already served in community custody during his SSOSA must be credited against the term of community custody to be served after his 123-month sentence is completed.[6] Because Miller's double jeopardy claim does not involve the consequences of a prior trial, we must examine only whether the legislature intended to require that Miller serve community custody both as part of his SSOSA and after incarceration for his reinstated 123-month sentence. See Thomas, 491 U.S. at 381, 109 S.Ct. 2522.
¶ 28 Miller's double jeopardy claim fails. An ordinary reading of the statute indicates that the legislature intended that a sex offender will serve community custody while a SSOSA is in effect and, if the SSOSA is revoked, will also serve additional community custody following incarceration. Indeed, community custody served during a SSOSA has a different purpose than community custody served after incarceration.
¶ 29 Pursuant to SSOSA, a trial court may suspend a defendant's sentence and place the defendant in community custody:
If the court determines that this special sex offender sentencing alternative is appropriate, the court shall then impose a sentence within the sentence range. If this sentence is less than eleven years of confinement, the court may suspend the execution of the sentence and impose the following conditions of suspension:
(A) The court shall place the defendant on community custody for the length of the suspended sentence or three years, whichever is greater, and require the offender to comply with any conditions imposed by the department of corrections under subsection (14) of this section;
(B) The court shall order treatment for any period up to three years in duration.. . . In addition, as conditions of the suspended sentence, the court may impose other sentence conditions including up to six months of confinement.
Former RCW 9.94A.120(8)(a)(ii). This type of community custody served by a sex offender pursuant to SSOSA, former RCW 9.94A.120(8)(a)(ii), is distinct from the community custody term that any sex offender must serve upon release from incarceration, former RCW 9.94A.120(10)(a). The express language of the sentencing statute, former RCW 9.94A.120, indicates that the legislature requires the trial court to impose a term of community custody to follow incarceration for any sentence imposed for a sex offense. Former RCW 9.94A.120(10)(a) provides:
When a court sentences a person to the custody of the department of corrections *464 for an offense categorized as a sex offense. . . the court shall, in addition to other terms of the sentence, sentence the offender to community custody for three years or up to the period of earned early release. . . . The community custody shall begin either upon completion of the term of confinement or at such time as the offender is transferred to community custody in lieu of earned early release. . . .
The statute further provides that the trial court may extend the conditions of community custody beyond the term of community custody, with any violation after the expiration of the term punished as contempt of court. Former RCW 9.94A.120(10)(c). No such provision is included within the provisions regarding community custody served during a suspended SSOSA sentence.
¶ 30 The policy behind imposing a term of community custody to follow incarceration indicates that the legislature did not intend for a defendant to be credited for time served in community custody prior to incarceration. The legislature, in amending the SRA to include the provisions requiring the trial court to impose a period of community custody to follow incarceration, noted the especially vital role that community custody after incarceration plays in a sex offender's reintegration into the community:
The legislature finds that improving the supervision of convicted sex offenders in the community upon release from incarceration is a substantial public policy goal, in that effective supervision accomplishes many purposes including protecting the community, supporting crime victims, assisting offenders to change, and providing important information to decision makers.
Laws of 1996, ch. 275, § 1. Time served in the community after incarceration while still under the jurisdiction of the trial court and the Department of Corrections "serves the purposes of helping the offender `improve him[self]' by providing the offender with time and resources necessary to reintegrate into the community, while at the same time `[p]rotect[ing] the public' by subjecting the offender to controls by the Department of Corrections." State v. Jones, 151 Wash.App. 186, 193, 210 P.3d 1068 (2009) (alterations in original) (quoting former RCW 9.94A.010(4), (5)), review granted, 167 Wash.2d 1017, 224 P.3d 773 (2010); see also Laws of 1996, ch. 275, § 1.
¶ 31 Comparing the policy reasons behind community custody following incarceration and the policy reasons behind community custody during a SSOSA sentence, it is apparent that the legislature did not intend for the two to be comingled. The SRA allows first time sex offenders to serve a SSOSA in community custody while completing treatment because
[t]he [Sentencing Guidelines] Commission was concerned that voluntary treatment programs would be rejected by offenders in confinement because the treatment is intrusive and far more difficult than passively serving a sentence. Treatment professionals argued that absent the incentive provided by the possibility of early release, few offenders would choose to participate in the treatment programs.
DAVID BOERNER, SENTENCING IN WASHINGTON, § 8.1 at 8-2 (1985). Importantly, professionals and advocates "argued that eliminating treatment as an alternative to confinement would cause many victims not to report sex crimes, especially in cases of intra-familial sexual abuse against children." BOERNER, § 8.1 at 8-1 (footnote omitted).
¶ 32 Most importantly, the express language of the SSOSA statute indicates that the legislature did not intend for a defendant to be credited for time served in community custody as part of a suspended sentence. Former RCW 9.94A.120(8)(a)(vi) provides:
The court may revoke the suspended sentence at any time during the period of community custody and order execution of the sentence if: (A) The defendant violates the conditions of the suspended sentence, or (B) the court finds that the defendant is failing to make satisfactory progress in treatment. All confinement time served during the period of community custody shall be credited to the offender if the suspended sentence is revoked.
Thus, the statute explicitly provides that confinement time must be credited where a suspended sentence is revoked. "The Act *465 expressly provides that credit against the revoked term be given for all confinement time served. Credit for time served in jail as a condition of probation has been held to be required by constitutional double jeopardy principles, and this provision is consistent with that constitutional requirement." BOERNER, § 8.8 at 8-20 (footnotes omitted) (internal quotation marks omitted) (citing State v. Phelan, 100 Wash.2d 508, 671 P.2d 1212 (1983)).
¶ 33 Notably, the SSOSA statute does not provide that community custody time must be credited where a suspended sentence is revoked. Moreover, the sentencing statute operating in 1998 provides evidence that our legislature was aware that it could credit community custody against community placement. Former RCW 9.94A.120(9)(a), relating to sentencing on certain offenses, provides that
the court shall in addition to the other terms of the sentence, sentence the offender to a one-year term of community placement beginning . . . upon completion of the term of confinement. . . . When the court sentences an offender under this subsection to the statutory maximum period of confinement then the community placement portion of the sentence shall consist entirely of such community custody to which the offender may become eligible. . . . Any period of community custody actually served shall be credited against the community placement portion of the sentence.

Former RCW 9.94A.120(9)(a) (emphasis added); see also former RCW 9.94A.120(9)(b).
¶ 34 The express language of the statutory provisions of the SSOSA statute and the general sex offender sentencing requirements indicate that the legislature intended for a sex offender serving a sentence after a revoked SSOSA to serve an additional term of community custody following incarceration without being granted credit for time earlier served in community custody during the suspended SSOSA sentence. Further, the policy purposes behind the two forms of community custody indicate that community custody ordered to be served after incarceration has different purposes and implications than the community custody ordered to be served as a portion of a defendant's SSOSA sentence.[7]
¶ 35 Thus, the legislature intended that a defendant would serve a term of community placement after incarceration regardless of whether the defendant had earlier served time in community custody during the period of a suspended sentence. Accordingly, the total punishment imposed herein did not exceed that authorized by the legislature. See Thomas, 491 U.S. at 381, 109 S.Ct. 2522.
¶ 36 Nevertheless, our Supreme Court has held that "even if the sentence is within the range authorized by the legislature, double jeopardy may still pose a bar if the defendant has a legitimate expectation of finality in his or her sentence." State v. Gonzalez, 168 Wash.2d 256, 268-69, 226 P.3d 131 (2010) (citing Pennsylvania v. Goldhammer, 474 U.S. 28, 30-31, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985); State v. Hardesty, 129 Wash.2d 303, 311, 915 P.2d 1080 (1996)), cert. denied, ___ U.S. ___, 131 S.Ct. 318, 178 L.Ed.2d 207 (2010). A defendant "acquires a legitimate expectation of finality in a sentence, substantially or fully served, unless the defendant was on notice the sentence might be modified." *466 Hardesty, 129 Wash.2d at 312, 915 P.2d 1080.
¶ 37 Here, Miller had no legitimate expectation of finality in his sentence. He had not completed his suspended sentence, and he was aware that it would be revoked if he were to violate the conditions imposed upon him. Moreover, Miller's judgment and sentence, at paragraph 4.8, explicitly states:
The court may revoke the suspended sentence at any time during the period of community supervision and order execution of the sentence, and shall impose conditions of community placement, if the defendant violates the conditions of the suspended sentence, or the court finds that the defendant is failing to make satisfactory progress in treatment. RCW 9.94A.120.
CP at 37 (emphasis added). Thus, Miller was on notice specifically that were his suspended sentence revoked and the execution of his 123-month sentence ordered, then community placement conditions would be imposed at the time of revocation. That is precisely what occurred here. Accordingly, Miller did not have a legitimate expectation of finality in his sentence that would prohibit the imposition of an additional term of community placement.
¶ 38 Because the imposition of an additional term of community custody without crediting the time previously served in community custody during a suspended SSOSA sentence is consistent with the legislature's intent and because Miller did not have a legitimate expectation of finality, double jeopardy prohibitions were not violated.

IV
¶ 39 Miller finally contends that the trial court exceeded its statutory authority when it imposed a 10-year term of community custody. We agree.
¶ 40 A trial court may impose only a sentence that is authorized by statute. In re Postsentence Review of Leach, 161 Wash.2d 180, 184, 163 P.3d 782 (2007). The relevant statute herein authorizes the trial court to impose only three years of community custody. Former RCW 9.94A.120(10) ("[T]he court shall . . . sentence the offender to community custody for three years."). The State correctly concedes that the 10-year term of community custody imposed herein is outside that authorized by the legislature. We accept the State's concession. Accordingly, we must reverse this component of Miller's sentence and remand the cause to the trial court for reimposition of the suspended sentence.
¶ 41 We affirm in part and reverse in part. The cause is remanded for reimposition of the suspended sentence.
We concur: LAU and APPELWICK, J J.
NOTES
[1] Miller's sex offender treatment period was extended once.
[2] The same is true under the SRA in effect at the time Miller committed his offense. See former RCW 9.94A.170(3) (1998) ("Any period of supervision shall be tolled during any period of time the offender is in confinement for any reason.").
[3] From the records and the briefing provided for our review, we cannot ascertain the precise amount of time that Miller had remaining in his term of community custody. This ambiguity is immaterial to our decision. It is apparent from the record that, on the date of the hearing, Miller had fewer than 365 days of community custody remaining.
[4] The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." Similarly, the Washington State Constitution provides that "[n]o person shall be . . . twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9. Washington's double jeopardy clause "is given the same interpretation the Supreme Court gives to the Fifth Amendment." State v. Gocken, 127 Wash.2d 95, 107, 896 P.2d 1267 (1995).
[5] "[W]hen a punishment is imposed for violating conditions of supervised release, the punishment is attributed to the original offense." State v. Madsen, 153 Wash.App. 471, 477, 228 P.3d 24 (2009) (citing Johnson v. United States, 529 U.S. 694, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000)), review denied, 168 Wash.2d 1034, 230 P.3d 1061 (2010). Thus, revocation of a suspended sentence is not a new prosecution but merely the continuing consequence of an earlier prosecution. In re Det. of Albrecht, 147 Wash.2d 1, 13, 51 P.3d 73 (2002).
[6] The maximum punishment for Miller's crime, rape of a child in the first degree, is life imprisonment. RCW 9A.44.073; RCW 9A.20.021.
[7] Helpfully, the United States Supreme Court, in determining the intent of the federal sentencing scheme, explained the policy rationale for requiring a new term of community placement after a revoked sentence is served:

Congress aimed . . . to use the district courts' discretionary judgment to allocate supervision to those releasees who needed it most. But forbidding the reimposition of supervised release after revocation and reimprisonment would be fundamentally contrary to that scheme. A violation of the terms of supervised release tends to confirm the judgment that help was necessary, and if any prisoner might profit from the decompression stage of supervised release, no prisoner needs it more than one who has already tried liberty and failed.
Johnson, 529 U.S. at 709, 120 S.Ct. 1795 (emphasis added). As here, the statute at issue in Johnson did not speak directly to the question of whether a "court revoking a term of supervised release in favor of reimprisonment may require service of a further term of supervised release following the further incarceration." 529 U.S. at 704, 120 S.Ct. 1795. The Court held that the trial court had such authority under the federal sentencing guidelines. Johnson, 529 U.S. at 713, 120 S.Ct. 1795.