# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

        Respondent,

        v.

MARLOWE M. WESTRA,

        Appellant.

)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 71960-2-I

UNPUBLISHED OPINION

FILED: August 11, 2014

DWYER, J. — "The [special sex offender sentencing alternative] statute offers certain offenders the chance to live and work in the community so long as they comply with treatment and other conditions." State v. Pannell, 173 Wn.2d 222, 234, 267 P.3d 349 (2011); former RCW 9.94A.670(10) (2009). Failure to comply with treatment and special sex offender sentencing alternative (SSOSA) conditions may result in the deprivation of this "relative freedom." Pannell, 173 Wn.2d at 234. Indeed, a trial court may properly revoke an offender's SSOSA, even several years into the offender's suspended sentence, for failure to comply with treatment and SSOSA conditions. State v. Miller, 159 Wn. App. 911, 914, 247 P.3d 457 (2011). Here, more than five years after the trial court granted Marlowe Westra's SSOSA request and suspended his sentence of confinement, Westra violated his SSOSA conditions and was described by his former treatment provider as "an untreated sex offender [who] continues to pose a high

risk to the community." The trial court revoked the SSOSA sentence and imposed the suspended period of incarceration. We affirm.

I

In 2007, Marlowe Westra was charged with and pleaded guilty to two counts of child molestation in the first degree, in violation of RCW 9A.44.083.[1] Westra committed the offenses against his six-year-old twin granddaughters, Ma.R. and Mi.R. During an appointment with a pediatrician, Westra's granddaughters revealed that Westra had touched their "vaginal areas," sometime between December 12, 2005 and February 3, 2006. Following his guilty pleas, Westra requested that he be granted a SSOSA sentence.

Although Westra admitted that he had molested other victims prior to 2007, he had no prior felony convictions. Westra molested another granddaughter, A.R. (Ma.R. and Mi.R.'s older sister), for which he was not criminally charged. Moreover, Westra admitted that he molested five other victims, girls between ages six and 10, more than 30 years previously. One of Westra's five other victims was his daughter, J.W. (Ma.R. and Mi.R.'s mother). Westra admitted that he molested J.W. when she was five years old. However, J.W. requested that her father be granted a SSOSA sentence because she

---

[1] Child molestation in the first degree occurs when a "person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." RCW 9A.44.083.

believed that he would succeed if he were given the opportunity to participate in treatment.[2]

In January 2007, Michael Comte, a certified sex offender treatment provider, conducted Westra's psychosexual evaluation and provided his treatment plan.[3] Comte concluded that Westra was an appropriate candidate for a SSOSA sentence because, "[d]espite [his] history of child molestation, his prognosis [was] positive." At the time, Comte's opinion was that, "[i]n the short-term[,] fear of the consequences [would] motivate [Westra's] conformity and self-control," and that he would "eventually invest in his therapy, which [would] reduce long-term reoffense probabilities." The Department of Corrections, in its May 2007 presentence report, also recommended that Westra be granted a SSOSA sentence.

In September 2007, Westra was sentenced to confinement for 89 months to life for each of the two counts of child molestation in the first degree, each sentence to run concurrently. However, the sentencing court granted Westra's

---

[2] "The court shall give great weight to the victim's opinion whether the offender should receive a treatment disposition under this section." Former RCW 9.94A.670(4).

> "Victim" means any person who has sustained emotional, psychological, physical, or financial injury to person or property as a result of the crime charged. "Victim" also means a parent or guardian of a victim who is a minor child unless the parent or guardian is the perpetrator of the offense.

Former RCW 9.94A.670(1)(c).

[3] "If the court finds the offender is eligible for [the SSOSA], the court, on its own motion or the motion of the state or the offender, may order an examination to determine whether the offender is amenable to treatment." Former RCW 9.94A.670(3). "The examiner shall assess and report regarding the offender's amenability to treatment and relative risk to the community." Former RCW 9.94A.670(3)(b).

SSOSA request, suspending all but 171 days of his sentence and ordering that Westra comply with certain conditions.

Westra was ordered not to have any direct or indirect contact with Ma.R., Mi.R., and A.R., "including, but not limited to, personal, verbal, telephonic, written or contact through a third party for life," without prior written authorization from his treatment provider or Community Corrections Officer (CCO). Moreover, Westra was ordered to "[h]ave no contact with any minor (under the age of 18) without prior written authorization"; "[a]void places where children congregate," including "[f]ast-food outlets, libraries, theaters, shopping malls, play grounds and parks"; and "not frequent establishments where minor children are likely to be present[,] such as school playgrounds, parks, roller skating rinks, video arcades."

Westra was also required to "[u]ndergo and successfully complete an outpatient sex offender treatment program for a period of 3 years."[4] Specifically, he was to attend and complete sexual deviancy treatment with Dr. Daniel Yanisch, a certified sexual deviancy counselor. Furthermore, Westra was not to "own, use, or possess a firearm or ammunition." Westra began treatment with Dr. Yanisch in October 2007.

---

[4] Former RCW 9.94A.670(4)(c) provides that
>  [t]he court shall order treatment for any period up to five years in duration. The court, in its discretion, shall order outpatient sex offender treatment or inpatient sex offender treatment, if available. A community mental health center may not be used for such treatment unless it has an appropriate program designed for sex offender treatment. The offender shall not change sex offender treatment providers or treatment conditions without first notifying the prosecutor, the community corrections officer, and the court. If any party or the court objects to a proposed change, the offender shall not change providers or conditions without court approval after a hearing.

In April 2008, Westra petitioned the court, requesting modification of his SSOSA conditions to allow him to have contact with his daughter, J.W. The trial court granted his request and modified his SSOSA conditions to allow him to have contact with J.W., stipulating that Westra "'may go to her residence when her children are not there.'"

In August 2008, Westra violated his treatment conditions when he failed to secure prior approval from his treatment provider or CCO to attend a wedding at which children were present. As a result of the violation, Westra was jailed for one month, and the State requested that Westra's SSOSA be revoked. However, in February 2009, the trial court ordered that Westra's SSOSA status, his requirement of treatment, and all other conditions continue, despite its finding that Westra had "yet to fully comply with and successfully complete all of the requirements and conditions of [his] treatment program."

In May 2010, the State again requested that Westra's SSOSA be revoked, averring that Westra had failed "to progress or succeed in sex offender treatment," failed "to be honest with his community corrections officer and/or treatment provider," lied during a February 2010 plethysmography assessment, and failed his April 2010 polygraph examination.

At this time, Dr. Yanisch indicated that, despite the fact that Westra was "in compliance and completing assignments, he still ha[d] minimal insight to his criminal behavior." Dr. Yanisch further noted that Westra was "not taking responsibility or accountability for his offending and [continued] to have problems with honest reflections of sexual arousal, even though he ha[d] been in treatment

since October of 2007." Moreover, Westra's CCO, Stacey Stark, reported that Westra had tried to mislead an individual who had administered his plethysmograph examination by stating "that he had been charged with possession of minor pornography instead of Child Molestation I," and that Westra had given deceptive responses in his April 2010 polygraph assessment by failing to disclose all of his admitted victims.

Although the trial court found that Westra had "yet to fully comply with and successfully complete all of the requirements and conditions of [his] treatment program," it ordered that Westra's treatment continue, along with all other conditions and requirements of his SSOSA.

In October 2010, the State requested for a third time that Westra's SSOSA be revoked, averring that Westra had failed

> to make satisfactory progress in treatment by failing to have any understanding or insight into his deviant behaviors after spending three years in sexual deviancy treatment with Dr. Daniel Yanisch, as demonstrated by his believing he is a "victim of the system," by minimizing his offenses, and by continuing to refuse to accept responsibility for his sexual deviancy."

Dr. Yanisch reported that Westra had been participating in group therapy "from October 2007 until February 2010, but [his participation] was discontinued when it became clear that [Westra] was no longer benefitting from information or feedback from peers or the facilitator." Furthermore, Westra had a "tendency to think of himself as a 'victim of the system,'" and he "resolutely [clung] to his self-perception that he [was] not as bad as his behavior (of repetitive sexual contact with young girls) would indicate." However, Westra did "better in individual

sessions than he had in group therapy" because individual sessions "better addresse[d] his cognitive abilities."

In October 2010, Dr. Yanisch opined that SSOSA treatment was still appropriate for Westra. Although the trial court, for a third time, found that Westra had "yet to fully comply with and successfully complete all of the requirements and conditions of [his] treatment program," it nevertheless ordered that Westra's treatment continue in June 2011. However, the trial court ordered that Westra enter treatment with a different provider, and that he "continue to comply with recommendations outlined in Dr. Covell's assessment."[5]

In June 2011, Westra entered treatment with a new provider, Daniel DeWaelsche, M.A. DeWaelsche addressed some treatment issues with Westra on a regular basis, particularly a concern about Westra's contact with a neighbor, a single mother with five children. On one occasion, Westra contacted the neighbor about a wasp nest in her yard, "telling her how dangerous that [it] would be for her children." This interaction concerned DeWaelsche, particularly the manner in which Westra had presented the issue, mentioning the children when DeWaelsche had instructed Westra that he should not do so. Westra had been "reminded that this type of contact could be viewed as grooming even if it was not his intention," and that he was not to have any contact with the neighbor's

---

[5] Westra sought a psychological evaluation for an assessment of his cognitive abilities from Christmas Covell, Ph.D. In January 2011, Dr. Covell reported that "Westra's functioning, presentation, and test performance indicate[d] that he [was] likely experiencing the early stages of a dementing process," and provided numerous recommendations for Westra's treatment. Although Dr. Covell recommended that "repeat assessments over time . . . [were] necessary to identify the nature and rate (if any) of progressive declines in functioning," the record contains no other similar reports.

children, including saying "hi" or making any gestures that "could possibly give them the impression that they can have a conversation with him."

In August 2012, the State filed its fourth petition, which eventuated Westra's SSOSA revocation. The bases for revocation, as set forth in the August 2012 petition, in pertinent part, were as follows:

1) Defendant has failed to comply with court-ordered conditions by violating the no contact order by possessing a photograph of victim/victim's family other than his own biological daughter; and
2) Defendant has failed to comply with court-ordered conditions by having contact with Mi.R., Mar.R., and/or A.R. on or before 8/23/12 while there is an active no contact order in effect; and
3) Defendant has failed to comply with court-ordered conditions by possessing .22 caliber ammunition on or before 8/23/12.

On August 21, 2012, Kimberly Carrillo, one of Westra's CCOs, recognized that Westra was driving an unfamiliar vehicle.[6] When Carrillo approached the vehicle, she saw a photograph of a young female on the dashboard. Westra stated that the photograph was of his daughter, but stammered and then admitted that the photograph was of his granddaughter. Westra was not permitted to view photographs of his victims, as this was considered a violation of his treatment rules.[7] Carrillo's supervisor authorized a search of Westra's vehicle and residence.

Carrillo searched the same vehicle two days later and—in a sealed plastic

---

[6] This vehicle belonged to Westra's wife. Carrillo would "occasionally meet [her] clients in the parking lot to inspect their vehicles to make sure they're in compliance with tabs, registration, insurance, that kind of thing."

[7] The photograph "was propped up so that the driver of the vehicle could have a direct visual of it." DeWaelsche testified that "[i]t's a standard rule not to have pictures of . . . victims in the house or anywhere" that Westra could view them.

bag located under the driver's seat of the vehicle—she found a photograph of all three of Westra's granddaughters. The photograph seen by Carrillo two days earlier was no longer on the dashboard, but was later found in Westra's bedroom.

When corrections officers searched Westra's residence, they discovered "a number of children's belongings right in the living room," including "school work, a drawing, [and] toys." Westra and his wife initially stated that they were storing items for Westra's daughter, but later admitted that Westra's granddaughters had been at the house. Westra stated that he was "usually . . . away from the house when they [had] come over," and that he would "run down to the garage or . . . run down to his shop" in the basement when his daughter would bring his granddaughters to the house unexpectedly. Westra's wife admitted that the granddaughters had come to the house and that she had informed Westra as to how the granddaughters were doing.

Furthermore, Westra volunteered that he may have had a rifle in his house, after he was questioned by corrections officers. Although the corrections officers did not find a rifle, they found .22 caliber ammunition in Westra's "shop" after he told the officers where the ammunition could be found.

On October 3, 2012, two corrections officers, Carrillo and Sally Saxon, interviewed Westra at the Pierce County jail, where he admitted "visual contact" with his granddaughters on "a couple of occasions." Specifically, Westra watched his granddaughters while he hid inside his garage. As he admitted, Westra "noticed that [his granddaughters] had been growing up[,] . . . looked

really beautiful[,] . . . had grown into beautiful women, [and] . . . had been developing" breasts. On another occasion, Westra listened to his granddaughters laugh and play while he hid inside his basement.

Westra had not informed DeWaelsche that his granddaughters had come to his house while he was there. Although two polygraph examinations indicated that Westra had not reoffended by having sexual contact with minors, DeWaelsche terminated Westra from treatment on October 15, 2012.

> Given the new disclosures and the fact that [Westra] failed to report his contact with his victims to his therapy group, therapist and community corrections officer, I have decided to terminate him from the sex offender treatment program with this agency. It is evident that [Westra] has been living a covert lifestyle. He should be considered an untreated sex offender that continues to pose a high risk to the community.[8]

As a result of Westra's termination from treatment with DeWaelsche, the State supplemented its August 2012 petition to include additional violations: that Westra had "failed to make satisfactory progress in treatment," and that he had

---

[8] At Westra's SSOSA revocation hearing, DeWaelsche testified regarding the issue of Westra's granddaughters being at his house:

Q: Now, as far as the contact with his victims, was it your understanding that his claim was they would come over and he would leave, so his claim is he's not actually in a room engaging with them?

A: Well, that's his claim and yet he never brought that in, and he would have been told that he was not to be on the property at all if the victims came over there. That would have been a real clear message. It's a clear message for anybody that I have. Sometimes victims will come over to, say, grandparents or to their parents' home, but the perpetrator is not to be in there unless there has been some change in the court order and there would be an agreement as the treatment provider, the Department of Corrections, and the Court, that we all felt comfortable for him to do that.

Q: And was there any type of that conversation about whether or not his granddaughters could come over?

A: No. He never brought up any information about him having any contact with his granddaughters.

"failed to comply with court-ordered conditions by being terminated from sex offender treatment by Daniel DeWaelsche."

After DeWaelsche terminated Westra from treatment, Jeanglee Tracer, another sex offender treatment provider, met with Westra on December 4, 2012 while Westra was in the Pierce County jail. Tracer was willing to treat Westra: "If the Judge permits Mr. Westra to remain in the community and to continue in treatment, I will accept him into my program with the recommendation [that] a review hearing be scheduled 90 days from the date he is released from the Pierce County Jail."

However, after a full hearing, the trial court revoked Westra's SSOSA sentence. In doing so, the trial court found that Westra was "fully informed of the conditions of his SSOSA sentence," and concluded, by a preponderance of the evidence, that Westra "violated the conditions of his SSOSA sentence by having contact with his three minor granddaughters, Ma.R., Mi.R., and A.R.[,] between August 27, 2008 and August 23, 2012[,] by peering at them through a window and by his presence when they were in his house."

Additionally, the trial court found that Westra violated conditions of his SSOSA "by not reporting the contact with his three granddaughters to either his CCO or his treatment provider"; "by failing to make progress in treatment . . . although his ability to make progress may be limited by his cognitive limitations and possibility of early signs of dementia"; and "by being terminated from sex offender treatment by Mr. DeWaelsche." Moreover, the trial court determined that Westra "violated the conditions of his SSOSA sentence by being in

possession of .22 caliber ammunition."

Westra appeals.

II

Westra contends that the trial court abused its discretion when it revoked his SSOSA. This is so, Westra asserts, because the "facts relied upon by the trial court to revoke the SSOSA sentence are either not supported by the record, do not constitute a violation of his suspended sentence, or are so minimal that it is likely the court would not have revoked on that fact alone." We disagree.

"Revocation of a suspended sentence due to violations rests within the discretion of the trial court and will not be disturbed absent an abuse of discretion." State v. McCormick, 166 Wn.2d 689, 705-06, 213 P.3d 32 (2009). "An abuse of discretion occurs only when the decision of the court is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" McCormick, 166 Wn.2d at 706 (quoting State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

"A SSOSA sentence may be revoked at any time if there is sufficient proof to reasonably satisfy the court that the offender has violated a condition of the suspended sentence or failed to make satisfactory progress in treatment." McCormick, 166 Wn.2d at 705; former RCW 9.94A.670(10). "The revocation of a suspended sentence is not a criminal proceeding, but rather an extension of the original criminal conviction." McCormick, 166 Wn.2d at 699. "Accordingly, an offender facing a revocation of a suspended sentence has only minimal due process rights because the trial has already occurred and the offender was found

- 12 -

guilty beyond a reasonable doubt." McCormick, 166 Wn.2d at 700 (citing State v. Dahl, 139 Wn.2d 678, 683, 990 P.2d 396 (1999)). "Once a SSOSA is revoked, the original sentence is reinstated." Miller, 159 Wn. App. at 918 (citing Dahl, 139 Wn.2d at 683).

In this case, the trial court articulated several reasons for revoking Westra's SSOSA. Not only did Westra violate the conditions of his suspended sentence, he also failed to make progress in treatment and was twice terminated therefrom. Westra was most recently terminated from treatment based on his treatment provider's opinion that he was "living a covert lifestyle" and that "[h]e should be considered an untreated sex offender that continues to pose a high risk to the community."

Furthermore, the trial court—at the conclusion of each of the three prior hearings to determine Westra's compliance with SSOSA conditions—found that Westra had "yet to fully comply with and successfully complete all of the requirements and conditions of [his] treatment program." After the State petitioned a fourth time to determine Westra's compliance with SSOSA conditions, the trial court found that Westra had still failed "to make progress in treatment pursuant to RCW 9.94A.670."

Westra asserts on appeal that he did not violate the condition that he attend and complete treatment because he "was simply terminated from one treatment *provider*." Westra's assertion is unavailing. Although Tracer acknowledged that she would have treated Westra if the conditions of his SSOSA had been continued, Tracer would have been Westra's third treatment

- 13 -

provider during the period of his suspended sentence. Westra's SSOSA conditions included the requirement that he "attend and complete treatment," something he failed to accomplish after documented problems with two different treatment providers, and more than five years after he was granted a SSOSA disposition. Thus, the trial court's revocation of Westra's SSOSA was not manifestly unreasonably, nor was it exercised on untenable grounds or for untenable reasons.

### III

Although the trial court found that Westra failed to make satisfactory progress in treatment, a failing that constituted sufficient justification for Westra's SSOSA revocation, it also found that Westra violated another condition of his SSOSA. Specifically, Westra violated the condition that he not have any contact with his victims, including his minor granddaughters.

On appeal, Westra contends that the trial court's revocation of his SSOSA failed to comport with due process because he had inadequate notice that the contact with his granddaughters—"by peering at them through a window and by his presence when they were in his house"—constituted a violation of his SSOSA conditions. This is so, Westra asserts, because it was "not clear that simply being in the vicinity of his granddaughters, even while making every effort to ensure that his granddaughters did not have to hear, see, or otherwise have any interaction with him, still constitute[d] 'contact' under the terms of the suspended sentence." Westra's contention lacks merit.

The due process clauses of the Fourteenth Amendment and article I, section 3 of the Washington Constitution require that citizens have fair warning of proscribed conduct. State v. Sanchez Valencia, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010). "A community custody [or SSOSA] condition does not satisfy this requirement if it fails to define the forbidden conduct with sufficient definiteness that ordinary people can understand what conduct is proscribed or does not provide ascertainable standards of guilt to protect against arbitrary enforcement." State v. Johnson, 180 Wn. App. 318, 326, 327 P.3d 704 (2014) (internal quotations omitted).[9] A trial court abuses its discretion when it imposes an unconstitutionally vague SSOSA condition. Sanchez Valencia, 169 Wn.2d at 792.

In this case, Westra was ordered not to have *any* direct or indirect contact with Ma.R., Mi.R., and A.R., "including, but not limited to, personal, verbal, telephonic, written or contact through a third party for life," without prior written authorization from his treatment provider and CCO. Additionally, Westra was ordered to "[h]ave no contact with any minor (under the age of 18) without prior written authorization"; "[a]void places where children congregate," including "[f]ast-food outlets, libraries, theaters, shopping malls, play grounds and parks";

---

[9] When an offender is granted a SSOSA disposition, the sentencing court "place[s] the offender on community custody for the length of the suspended sentence," and "impose[s] specific prohibitions and affirmative conditions." Former RCW 9.94A.670(4)(b), (d). Thus, community custody conditions imposed under the SSOSA statute are subject to the due process requirement that citizens have fair warning of proscribed conduct. Sanchez Valencia, 169 Wn.2d at 791; Johnson, 180 Wn. App. at 326.

and "not frequent establishments where minor children are likely to be present[,] such as school playgrounds, parks, roller skating rinks, video arcades."

Westra's SSOSA conditions—comprising several examples of prohibited contact—stated that Westra was to avoid *any* contact with his victims and avoid establishments where minor children were likely to be present. In 2008, Westra was jailed for violating the conditions of his SSOSA after attending a wedding at which children were present. Later, Westra's treatment provider, DeWaelsche, addressed the issue concerning Westra's neighbor, warning that Westra was not to mention or speak to his neighbor's children. These instances should have affirmed the already explicit conditions of Westra's SSOSA, and disabused Westra of his claimed belief that he could—without violating his SSOSA—peer at his granddaughters from his garage and be present while they were inside his house.

Essentially, Westra urges us to hold his SSOSA conditions to a definitional standard that is not required of either statutes or ordinances. See City of Seattle v. Eze, 111 Wn.2d 22, 27, 759 P.2d 366 (1988) (holding that "a statute is not unconstitutionally vague because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct"). Moreover, vagueness challenges involve an inquiry as to whether "ordinary people can understand what conduct is proscribed." Johnson, 180 Wn. App. at 326 (internal quotation marks omitted). Here, to assist Westra in clarifying and complying with the already definite conditions of his SSOSA, he was able to

inquire of his treatment provider, CCO, and the court[10]—means of assistance that are not commonly available to citizens who have not been convicted of criminal behavior.

In fact, the record supports the inference that Westra knew precisely how he could clarify or modify his SSOSA conditions. Indeed, in April 2008, less than a year after he was granted a SSOSA disposition, he did so by petitioning the trial court to modify his SSOSA conditions in order to have contact with his adult daughter. Although the trial court allowed the modification, it stipulated that "he may go to her residence when her children are not there," an explicit restriction that further belies his present contention that it was "not clear that simply being in the vicinity of his granddaughters, even while making every effort to ensure that his granddaughters did not have to hear, see, or otherwise have any interaction with him, still constitute[d] 'contact' under the terms of the suspended sentence."

The conditions of Westra's SSOSA, as modified at his request, were sufficiently clear to inform him that he was to avoid *any* kind of contact with his victims, not the least of which would include peering at his victims or listening to them laugh and play at his residence on separate occasions. "'[O]ne who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" State v. Evans, 177 Wn.2d 186, 203, 298 P.3d

---

[10] "The court shall conduct a hearing on the offender's progress in treatment at least once a year." Former 9.94A.670(7)(b). "At the hearing, the court may modify conditions of community custody including, but not limited to, crime-related prohibitions and affirmative conditions relating to activities and behaviors identified as part of, or relating to precursor activities and behaviors in, the offender's offense cycle or revoke the suspended sentence." Former 9.94A.670(7)(b).

724 (2013) (quoting <u>Boyce Motor Lines, Inc. v. United States</u>, 342 U.S. 337, 340, 72 S. Ct. 329, 96 L. Ed. 367 (1952)). An ordinary person would understand that Westra's conduct was at least "perilously close to an area of proscribed conduct." <u>Evans</u>, 177 Wn.2d at 203. Accordingly, Westra's SSOSA conditions delineated the forbidden conduct with sufficient definiteness.

In addition, Westra's SSOSA conditions provided ascertainable standards to protect against arbitrary enforcement. Unless his conditions were modified by the court, Westra was not to have any contact, whether direct or indirect, with his victims. Westra's conditions were never modified such that they would have allowed him to peer at his granddaughters from his garage or to listen to them upstairs while he was in the basement of his home. In this regard, the conditions of Westra's SSOSA left no room for arbitrary enforcement—Westra was not to have *any* contact with his granddaughters. Thus, the trial court did not abuse its discretion by enforcing the condition that Westra not have any contact with his victims. Nor did it abuse its discretion by revoking the SSOSA sentence and imposing the suspended term of incarceration.

Affirmed.

We concur:

- 18 -