# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48529-0-II |
| Respondent, | |
| v. | |
| RAMEIKO TERRELL GRAVES, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Rameiko Graves appeals from his first degree assault conviction and sentence, asserting that (1) the trial court's jury instructions failed to make the self-defense standard manifestly clear to the jury, (2) the prosecutor committed misconduct by misstating the law of self-defense, (3) the trial court's reasonable doubt instruction violated his due process right, and (4) the trial court erred at sentencing by imposing certain community custody conditions that were unrelated to his crime.[1]  We affirm Graves's conviction and remand for an amendment of his community custody conditions consistent with this opinion.

## FACTS

On January 25, 2015, Jeffrey Waldroop drank several alcoholic beverages and practiced using his sword in a grassy area outside of his apartment building.  A neighbor from the same apartment complex, Misty Torres, and some of Torres's friends watched Waldroop practicing with his sword.  Torres's boyfriend, Alex Bedford, and her friend, Graves, were among the group

---

[1] Graves also requests that we exercise our discretion to waive appellate fees in this matter. Because the State has indicated that it will not seek appellate costs, we need not address Graves's request.

watching Waldroop. Waldroop approached Torres to ask if his sword play was bothering her. After Torres told Waldroop that the sword play did not bother her, Waldroop returned to his apartment. Waldroop continued practicing with his sword when he noticed that Torres and her friends were again watching him. Waldroop spoke with the group, showed them his sword, and allowed Torres to hold the sword.

Waldroop continued practicing with his sword as it was getting dark outside. He went to Torres's apartment to ask if she wanted a cigarette. Bedford answered the door and told Waldroop that Torres was not there. According to Graves, who was standing behind Bedford when he answered the door, Waldroop was positioned in a fighting stance with both of his hands on the handle of the sword. Waldroop walked away and went to the patio of his apartment.

Later that evening, Bedford and Graves were outside in the parking lot of the apartment complex. Waldroop watched the men and was suspicious of their activity. Waldroop asked his brother, Michael Waldroop, to come outside and take a look. Michael[2] declined, and Waldroop went back outside to continue watching Bedford and Graves. Michael eventually went outside and took Waldroop's sword from him. Waldroop and Michael began walking back toward their apartment. Witnesses dispute what happened next.

Waldroop stated that he was knocked to the ground from behind and felt sharp pains in his back, sides, under his arm, and in his chest area. Michael then helped him to his bedroom, where he collapsed on his bed.

---

[2] Because Jeffrey and Michael share a last name, this opinion uses Michael's first name for clarity.

Michael stated that he saw Graves run up and repeatedly punch Waldroop. Michael told Graves to stop and that his brother was just drunk. When Graves stopped, Michael saw that Graves was holding a knife, and he realized that Graves had been stabbing his brother. Michael yelled for his girlfriend to call 911. Michael tried to help Waldroop stand up, but Graves returned and stabbed Waldroop several more times.

According to Bedford, after Michael took the sword and the two men were walking away, Graves "took out his knife, hid it behind his back, and basically was following behind him." Report of Proceedings (RP) at 124. Bedford then heard Michael yell, "Are you stabbing him?" RP at 125. Bedford ran back to his apartment. Graves came back to the apartment shortly after and said that he had "stabbed [Waldroop] six times and that he knew that he was going to go to jail." RP at 136. Graves washed blood off of his hands, opened the front door, and threw the knife into the parking lot. Graves said, "Get me out of here," and left the apartment with Torres for a short time before returning and waiting for police to arrive.

According to Graves, Waldroop and Michael were partway back inside their apartment when Waldroop grabbed the sword from Michael and started charging at him with the sword over his head. Graves stated that he feared for his life and, when Waldroop was approximately three feet away from him, he pulled out his knife. When Waldroop got close enough to make contact, Graves stabbed him in the abdomen. Waldroop did not drop the sword, so Graves stabbed him under the armpit. Graves did not know at the time how many times he had stabbed Waldroop. Graves stated that he threw the knife because he did not want to appear as a threat to the police when they came to arrest him.

3

Based on this incident, the State charged Graves with first degree assault, alleging that he was armed with a deadly weapon during the commission of the crime. The matter proceeded to a jury trial.

The following exchanges took place during the State's cross-examination of Graves:

[State]: Nothing kept you from leaving if you thought that the situation was dangerous; right?
[Graves]: Yes.
[State]: You could have walked away?
[Graves]: Yes.
. . . .
[State]: So you're out there smoking, and, all of a sudden, [Waldroop] changes his demeanor?
[Graves]: Yes.
[State]: You said that he was holding the sword, and he gave you a bone-chilling stare?
[Graves]: Yes.
[State]: Did you feel scared?
[Graves]: At that point, I was a little concerned.
. . . .
[State]: Did you go inside?
[Graves]: No.
[State]: And you didn't call 911?
[Graves]: Not at that moment, no.
[State]: So someone is outside, holding this very large sword, giving you a bone-chilling stare, and you're not scared enough to go back inside?
[Graves]: Nope.
[State]: So his stare wasn't really that bone-chilling, was it?
[Graves]: Not enough to make me go back inside.
. . . .
[State]: You chose not to talk to him. You could have just went inside?
[Graves]: Yes.
[State]: But you didn't?
[Graves]: No.
[State]: You testified that, as he stood out there, he started getting really aggressive?
[Graves]: Yes.
[State]: And you still didn't go inside?
[Graves]: No.
[State]: So at this point, he's giving you bone-chilling stares, he's gotten very aggressive, but you don't go inside?

4

[Graves]: No.

[State]: You're just waiting for something to happen, aren't you?

. . . .

[Graves]: I'm just minding my own business, like I'm supposed to.

[State]: But you're not scared enough to go inside?

[Graves]: There's no reason to be scared. He didn't approach me until the last minute.

RP at 275-76, 278-81. The State argued the following during closing:

> And what was [Waldroop] doing between the two different attacks? Nothing. He couldn't even move. He's just there on hands and knees in the grass. Well, the defendant is arguing he only used the force that was reasonable to effect the lawful purpose. Well, he had already done the job. [Waldroop] was already in the grass. Why did he need to keep stabbing him?
>
> . . . .
>
> Ladies and gentlemen, his force was not reasonable to effect any lawful purpose, and no reasonable alternative to the use of force appeared to exist. Well, ladies and gentlemen, there were plenty of alternatives. When he was getting this bone-chilling death stare from [Waldroop], he could have went inside. He could have walked away at any point, but he didn't. He didn't because he wasn't ever scared of him.
>
> The defendant was never scared. He was waiting to make his move, waiting with his knife behind his back. He didn't like [Waldroop]. He thought he was weird. He didn't like the fact that he was standing in the grass, watching him. [Waldroop] was being nosy.
>
> You don't get to stab someone because of that. You sure don't get to stab him nine times because of that.

RP at 352-53. Graves did not object to this argument.

The trial court provided the jury with Graves's requested self-defense instructions. The trial court also provided jury instruction 6, which stated:

> It is not a defense to a criminal charge that the defendant believed his or her conduct was lawful. Ignorance of the law is no excuse for criminal conduct.

Clerk's Papers (CP) at 33. Graves did not object to jury instruction 6. Additionally, the trial court gave a standard reasonable doubt jury instruction based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 93 (4th ed. 2016), which stated in

5

relevant part, "If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." CP at 30. Graves did not object to this instruction.

The jury returned a verdict finding Graves guilty of first degree assault. The jury also returned a special verdict finding that Graves was armed with a deadly weapon during his commission of the crime. At sentencing, the trial court imposed community custody conditions (1) prohibiting Graves's possession and consumption of alcohol or controlled substances, (2) prohibiting him from entering bars or places where alcohol is the chief item of sale, (3) requiring him to submit to urinalysis and breath testing, and (4) requiring him to complete a substance abuse evaluation. Graves appeals from his conviction and sentence.

## ANALYSIS

### I. SELF-DEFENSE JURY INSTRUCTIONS

Graves first contends that the trial court's jury instructions violated his due process right by failing to make the self-defense standard manifestly clear to the jury. Graves appears to argue that jury instruction 6 informed the jury to disregard his subjective fear of imminent injury and, thus, diminished the State's burden to prove beyond a reasonable doubt the absence of self-defense. We hold that the instruction was proper and did not violate Graves's due process right.

We review a jury instruction challenge de novo and evaluate the challenged jury instruction "in the context of the instructions as a whole." *State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289 (1993) (plurality opinion). Jury instructions are sufficient if they allow the parties to argue their theories of the case, are not misleading, and properly inform the jury of the applicable law when read as a whole. *State v. McCreven*, 170 Wn. App. 444, 462, 284 P.3d 793 (2012). Self-defense jury instructions must do more than adequately convey the law; they

6

"'must make the relevant legal standard manifestly apparent to the average juror.'" *McCreven*, 170 Wn. App. at 462 (internal quotation marks omitted) (quoting *State v. LaFaber*, 128 Wn.2d 896, 900, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009)). A jury instruction that misstates the law on self-defense is an error of constitutional magnitude that an appellant may raise for the first time on appeal. RAP 2.5(a)(3); *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Graves does not contend that jury instruction 6 contains an incorrect statement of law. Instead, he argues that the instruction conflicted with other instructions informing the jury that the use of force is "lawful when used by a person who reasonably believes that he is about to be injured," and that the person employing such force may "act on appearances in defending himself, if he believes in good faith and on reasonable grounds that he is in actual danger or injury." CP at 41, 43. But a defendant's subjective belief that he or she is facing an imminent danger of injury is wholly unrelated to a defendant's ignorance of the law. A defendant's subjective belief of imminent danger of injury is relevant to a jury determination of whether the defendant lawfully engaged in self-defense, but the defendant's belief that his or her conduct was lawful is not. Because the jury instructions accurately and unambiguously conveyed this to the jury, Graves's contention fails.

## II. REASONABLE DOUBT JURY INSTRUCTION

Next, Graves contends that the trial court's reasonable doubt instruction violated his due process right by including language stating, "If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." CP at 30. Graves argues that this portion of the jury instruction improperly focused the jury on a search for "the

truth," rather than determining whether the State had met its burden of proving the elements of the crime beyond a reasonable doubt. Having addressed and rejected in *State v. Jenson*, 194 Wn. App. 900, 378 P.3d 270, *review denied*, 186 Wn.2d 1026 (2016), the same challenge Graves raises here, we adhere to our precedent and hold that the trial court's reasonable doubt instruction did not violate Graves's right to due process.

### III. PROSECUTORIAL MISCONDUCT

Next, Graves contends that the prosecutor committed misconduct during cross-examination and at closing by misstating the law of self-defense. Specifically, Graves argues that the prosecutor improperly suggested to the jury that Graves had a duty to retreat before lawfully employing the use of force. We disagree.

To prevail on his claims of prosecutorial misconduct, Graves must demonstrate that in the context of the entire record and trial circumstances the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To demonstrate prejudice, Graves must show a substantial likelihood that the improper conduct affected the verdict. *Thorgerson*, 172 Wn.2d at 442-43. Because Graves did not object to the alleged misconduct at trial, he is deemed to have waived the issue unless he can show that any misconduct was so flagrant and ill-intentioned that any resulting prejudice could not have been cured by a jury instruction. *Thorgerson*, 172 Wn.2d at 443.

A.      *Cross-examination*

Regarding the prosecutor's cross-examination of Graves, Graves does not demonstrate any improper conduct. When examined in context, the prosecutor's questions in reference to Graves's ability to leave the scene merely elicited from Graves that he did not fear Waldroop at

any point during the evening until Waldroop allegedly charged at him with the sword. The prosecutor did not question Graves about his ability to retreat from Waldroop when Waldroop was allegedly charging at him. Because there was some evidence at trial that Graves acted in self-defense, the State bore the burden of proving the absence of self-defense beyond a reasonable doubt. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). The State could meet this burden by proving Graves did not subjectively fear that Waldroop would injure him. *State v. George*, 161 Wn. App. 86, 96-97, 249 P.3d 202 (2011) Through her cross-examination, the prosecutor established that Graves could not claim self-defense based on any of Waldroop's conduct prior to Waldroop allegedly charging at him. We discern nothing improper in the prosecutor's inquiry.

B.      *Closing Argument*

Graves also fails to demonstrate that the prosecutor committed misconduct during closing argument. Again, when examined in context, the prosecutor's brief mention of Graves's apparent ability to leave the scene prior to Waldroop allegedly charging at him with the sword was to establish the State's theory that Graves never subjectively feared being injured by Waldroop. We discern nothing improper in this argument as it was the State's burden to prove the absence of self-defense and, in arguing that Graves did not act in self-defense at closing, the prosecutor had wide latitude to draw reasonable inferences from the facts in evidence and to express such inferences to the jury. *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003). Moreover, even assuming that the prosecutor's closing argument improperly suggested that Graves had a duty to retreat, any resulting prejudice was cured by the trial court's "no duty to

9

retreat" instruction. CP at 44. Accordingly, Graves fails to demonstrate that the prosecutor committed misconduct during closing argument.

## IV. COMMUNITY CUSTODY CONDITIONS

Finally, Graves contends that the trial court exceeded its sentencing authority by imposing certain community custody conditions that were unrelated to his crime. Specifically, he argues that trial court lacked statutory authority to order him (1) to refrain from possessing or consuming alcohol, illegal drugs, or marijuana, (2) to not enter any bars or places where alcohol is the chief item of sale (3) to undergo urinalysis and breath testing, and (4) to undergo a substance abuse evaluation. We agree in part, disagree in part, and remand for an amendment of Graves's community custody conditions consistent with this opinion.

A trial court may only impose a sentence that is authorized by statute. *State v. Miller*, 159 Wn. App. 911, 930-31, 247 P.3d 457 (2011). We generally review the imposition of crime-related community custody conditions for an abuse of discretion, but we review de novo whether a trial court had statutory authority to impose such conditions. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

Graves first contends that under RCW 9.94A.505(9), the trial court lacked statutory authority to prohibit his use of alcohol and controlled substances because there was no evidence presented at trial that alcohol or controlled substances related to his crime.[3] This contention fails

---

[3] In raising this contention, Graves appears to rely on the current version of RCW 9.94A.505(9), which was not in effect on the date Graves committed his crimes. The current version of RCW 9.94A.505(9) provides:

because the trial court's authority to prohibit Graves's use of alcohol or controlled substances did not depend on the condition relating to his crime of conviction. Rather, the trial court's authority to prohibit Graves's use of alcohol and controlled substances was derived from former RCW 9.94A.703(2)(c) (2009) and former RCW 9.94A.703(3)(e) (2009).[4] Because these provisions permitted the trial court to prohibit Graves from using controlled substances and alcohol regardless of whether controlled substances or alcohol were related to his crime, the prohibitions were statutorily authorized, and Graves's contention fails.

Next, Graves contends that the trial court lacked authority to prohibit his entry into bars or places where alcohol is the chief item of sale. We agree. Former RCW 9.94A.703 contains no specific provision granting the trial court authority to prohibit a convicted defendant's entry into bars or places that primarily sell alcohol. Therefore, the trial court lacked statutory authority to impose this prohibition unless it related to Graves's crime of conviction. Former RCW 9.94A.703(3)(f). Although there was some evidence at trial that Graves was drinking beer

---

As part of any sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter. *"Crime-related prohibitions" may include a prohibition on the use or possession of alcohol or controlled substances if the court finds that any chemical dependency or substance abuse contributed to the offense.*

But the above italicized language does not appear in the version of RCW 9.94A.505 applicable to Graves's sentence. *See* former RCW 9.94A.505(8) (2010); RCW 9.94A.345 ("Any sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed."). Accordingly, we do not consider it.

[4] Former RCW 9.94A.703(2) provided in relevant part, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . (c) Refrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." Former RCW 9.94A.703(3) provided in relevant part, "As part of any term of community custody, the court may order an offender to: . . . (e) Refrain from consuming alcohol."

shortly before assaulting Waldroop, there is no evidence that his patronizing of bars or businesses that sell alcohol contributed to the offense. Accordingly, the trial court lacked statutory authority to impose this condition, and we remand with instructions to strike the condition from Graves's sentence.

Next, Graves's challenges the condition requiring him to submit to urinalysis and breath testing. A trial court is authorized to impose community custody conditions that monitor an offender's compliance with other valid conditions. *State v. Riles*, 135 Wn.2d 326, 342-43, 957 P.2d 655 (1998), *abrogated on other grounds by State v. Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010); former RCW 9.94A.030(10) (2012). Here, the condition requiring Graves to submit to alcohol and breath testing was appropriate to monitor his compliance with the valid conditions prohibiting his use of alcohol or controlled substances.

Finally, Graves contends that the trial court lacked statutory authority to order him to undergo a substance abuse evaluation, again asserting that there was no evidence that alcohol or controlled substances were related to his crime. We disagree. Former RCW 9.94A.703(3)(c) provided the trial court with discretion to order Graves to "[p]articipate in *crime-related* treatment or counseling services." (Emphasis added.) Similarly, former RCW 9.94A.607 (1999) provided the trial court with authority to order Graves to participate in rehabilitative programs and to perform affirmative conduct reasonably related to the defendant's crime if the trial court found "that the offender has a chemical dependency that has contributed to his or her offense."

Here, Graves fails to acknowledge the evidence presented at trial that he had consumed alcohol shortly before assaulting Waldroop. Based on this evidence, we hold that the trial court did not abuse its discretion by imposing the crime-related condition that Graves undergo a

substance abuse evaluation under the statutory authority of former RCW 9.94A.703(3)(c) and former RCW 9.94A.607.

We affirm Graves's conviction and remand with instructions to strike the community custody condition prohibiting his entry into bars or places that primarily sell alcohol.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Bjorgen, C.J.

Johanson, J.